IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| DARSHITKUMAR PATEL,<br><br>   *Plaintiff,*<br><br> v.<br><br>KELLY SERVICES, INC.,<br><br>   *Defendant.* | CIVIL ACTION<br>NO. 22-2421 |

**PAPPERT, J.**                                         February 21, 2023

<u>MEMORANDUM</u>

   Kelly Services, Inc. is a staffing and recruiting company which solicited and recommended Darshitkumar Patel to its client, pharmaceutical company Menarini Silicon Biosystems. After a screening and interview process, MSB offered Patel a position. He accepted the offer and quit his job at Johnson & Johnson. MSB fired Patel after only a week because the job required a college degree—which he did not have. Once unemployed, Patel learned that Kelly falsely told MSB that he had a degree, and falsely told him that MSB did not require one. He sued Kelly for breach of contract, fraudulent and negligent misrepresentation, negligence, and detrimental reliance. Kelly moved to dismiss Patel's Amended Complaint. After considering the motion papers and holding oral argument, the Court grants Kelly's motion in part and denies it in part.

I

   Kelly contracted with MSB to screen and recruit applicants for a Senior Quality Assurance Specialist position. (Am. Compl. ¶¶ 12, 14, ECF 12.) In April of 2022, Kelly recruited Patel, who was working for J&J as a Quality Assurance Associate I. (*Id.*

1

¶¶ 9–11.) Patel does not have a bachelor's degree, but he completed one year of coursework in a degree program. Reflecting this, the "education" section of his resume says "BS, Computer Application (First year completion)." (*Id.* ¶ 26.) Patel emailed his resume to Kelly on April 7, 2022. (*Id.* ¶¶ 22–23.) Kelly responded to Patel's email later that day, stating that it would review his submission to determine if he met the job requirements. If he was identified as a potential candidate, a recruiter from Kelly would contact him to begin the recruiting process. (*Id.* ¶ 24.)

On April 12, Matt Tassoni, a Clinical Account Manager at Kelly, emailed MSB to suggest Patel as a potential candidate. In the email, he told MSB that Patel "has a B.S. in Computer Applications." ((*Id.* ¶ 28; Ex. A p. 5, ECF 12-1.) Additionally, he attached a copy of Patel's resume that had been altered to omit the "first year completion" qualifier from the education section. (Am. Compl. ¶ 27.) MSB agreed to interview Patel. (Ex. A p. 4.)

Prior to being interviewed, Patel texted Maggie Miller, another Kelly employee, to ask if MSB required a college degree. Miller responded, ". . . [N]o. When they placed the order months ago they just listed it as preferred. But they also stated they'd rather have experience vs degree. I don't think it will come up at all so nothing to worry about." (Am. Compl. ¶ 32.) Patel alleges Miller knew her statement that MSB did not require a college degree was false. (*Id.* ¶ 33.)

MSB did not ask Patel about his education during the interview. (*Id.* ¶ 35.) Around April 21, it offered him the Senior Quality Assurance Specialist position, with an annual salary of $83,500 and a start date of May 9, 2022. (*Id.* ¶¶ 15, 18.) Patel accepted MSB's offer and resigned from J&J. (*Id.* ¶ 16.) He started at MSB as planned

on May 9, but was fired on May 18 after management realized that he did not have a bachelor's degree, which MSB viewed as a requirement for the position. (*Id.* ¶ 36.)

II

A Rule 12(b)(6) motion tests the sufficiency of the factual allegations in the complaint. *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993). When confronted with a 12(b)(6) motion, a district court must conduct a two-step analysis. *Fowler v. UPMC Shadyside*, 578 F. 203, 210 (3d Cir. 2009). First, the Court "must accept all of the complaint's well-pleaded facts as true, but may disregard any legal conclusions." *Id.* at 210–11. Then, it "must determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Id.* at 211 (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). The Court must "construe the complaint in the light most favorable to the plaintiff . . . ." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008).

III

Patel styles Count I of the Amended Complaint as a claim for "(a) Fraud; (b) Misrepresentation; (c) Negligent misrepresentation; and/or (d) False inducement." (Am. Compl. ¶ 43.) In Pennsylvania, "'[f]raud' is a generic term, which embraces a great variety of actionable wrongs." 2 SUMM. PA. JUR. 2d Torts § 16:1 (2d ed.). At oral argument, Plaintiff's counsel clarified that Count I was intended to cover fraudulent and negligent misrepresentation.[1] (Hrg. Tr. 4:1–22, ECF 28.)

---

[1]   Counsel also suggested that Count I alleges fraudulent inducement. (Hrg. Tr. 4:13–14, ECF 28.) Claims of fraudulent inducement to accept employment represent a subset of fraudulent misrepresentation claims in which the plaintiff's damages stem from resigning from a previous job in order to accept an employment offer that ultimately does not work out as expected. 2 SUMM. PA. JUR. 2d Torts § 16:54 (2d ed.).

A

As an initial matter, Kelly argues that Patel's allegations do not satisfy Federal Rule of Civil Procedure 9(b)'s heightened pleading standard. That rule requires a plaintiff to "state the circumstances of the alleged fraud with sufficient particularity to place the defendant on notice of the precise misconduct with which it is charged." *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007) (quotation omitted) (cleaned up). "[T]he plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation." *Id.* Patel relies on two statements by Kelly employees to support his fraud-based claims. He first alleges that on April 12, 2022, at 8:24 a.m., Matt Tassoni sent MSB's hiring manager an email falsely stating that Patel "has a B.S. in Computer Applications," attaching the altered version of Patel's resume. (Am. Compl. ¶¶ 27–29; Ex. A at 5.) This allegation is specific enough. Second, Patel states that at some point "[d]uring the anticipated and actual interview process with MSB and prior to giving notice of resignation to J & J," Maggie Miller told him in a text message that a college degree was not required for the MSB position. (Am. Compl. ¶ 32.) Although Patel does not include the exact date and time Miller sent the text, he has provided sufficient information about the speaker, the timeframe, and the mode of communication to put Kelly "on notice of the precise misconduct alleged."

B.

Under Pennsylvania law, fraudulent misrepresentation claims have six elements: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or

4

false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 771 (3d Cir. 2009) (quotation omitted).

1

Patel's fraudulent misrepresentation claims fail to the extent they are based on Tassoni's statement to MSB that Patel had a bachelor's degree. "For a *prima facie* case of fraud, the *recipient* of the misrepresentation must be the one to reasonably rely upon the misrepresentation and to be damaged as a proximate cause of that reliance." *Joyce v. Erie Ins. Exch.*, 74 A.3d 157, 167 (Pa. Super. Ct. 2013) (quotation omitted). Patel was not the recipient of Tassoni's alleged misrepresentation, nor did he even learn of it until after he was fired. He could not have relied on whatever Tassoni said to MSB in deciding to quit his job with J&J. (Am. Compl. ¶¶ 27, 31.)

2

Patel may, however, proceed with his claim for fraudulent misrepresentation based on Maggie Miller's alleged statement to him that MSB did not require a college degree. He alleges that Miller told him a degree was not required, even though she knew it was. (*Id.* ¶¶ 32–33.) Patel has alleged that this information was material to his belief that he was qualified for the position—he was concerned enough about his lack of a degree to specifically ask Miller whether it disqualified him from the position, and MSB later told Patel that he was fired because he did not have a degree. (*Id.* ¶¶ 32, 36.) Patel also alleges that Miller lied about the job requirements "so that [Patel] would continue through the recruitment and hiring process with MSB (such that

5

Defendant could make a substantial recruitment fee upon Plaintiff's placement)." (*Id.* ¶ 33.) Patel was also justified in relying on Miller for information about the job requirements because of her role in screening applicants for the position and her reference to communications she had with MSB about the position requirements. (*Id.* ¶ 32.)

Whether Miller's misrepresentation proximately caused Patel to leave J&J is a closer question. The proper inquiry in the causation analysis is whether the defendant's acts were a "substantial factor" in bringing about the plaintiff's injury. *Bouriez*, 585 F.3d at 771–72. Kelly argues that MSB's failure to ask about Patel's education in the interview is an intervening, superseding cause of his injuries. But Miller told Patel his education was not "likely to come up" in the interview, which suggests that MSB relied on Kelly to confirm that he met the educational requirements. As a result, MSB's failure to ask about something it had already been told was not an issue was not an "event" that would break the causal chain between Kelly's misstatement and Patel's injury. For now, Patel has sufficiently alleged that he left J&J for MSB at least in part because Miller assured him that his lack of a degree did not disqualify him from the Senior Quality Assurance Specialist position at MSB.

C

In the alternative, Patel alleges negligent misrepresentation based on the same statements by Tassoni[2] and Miller. A claim of negligent misrepresentation requires "(1) a misrepresentation of a material fact; (2) made under circumstances in which the actor

---

[2] Tassoni's statement to MSB cannot be a negligent misrepresentation for the same reason it wasn't a fraudulent one, *see supra* Part III.B.1, so the Court limits its analysis to Miller's alleged statement to Patel that MSB did not require a college degree.

should have known of its falsity; (3) with an intent to induce another to act on it; (4) thereby causing injury to a party who justifiably relied on the misrepresentation." *Gregg v. Ameriprise Fin., Inc.*, 245 A.3d 637, 646 (Pa. 2021).  The difference between negligent and fraudulent misrepresentation is that "to commit the former, the speaker need not know his or her words are untrue, but must have failed to make reasonable investigation of the truth of those words." *Gibbs v. Ernst*, 647 A.2d 882, 890 (Pa. 1994). "Moreover, like any action in negligence, there must be an existence of a duty owed" by the defendant to the plaintiff. *Bilt-Rite Contractors, Inc. v. The Architectural Studio*, 866 A.2d 270, 277 (Pa. 2005) (quotation omitted).

      The key question is whether a staffing agency owes applicants a legal duty to accurately answer questions about an employer's job requirements.  The parties cannot point to, and the Court has not found, any authority for such a proposition under Pennsylvania law.  The Supreme Court of Pennsylvania has adopted § 552 of the Restatement (Second) of Torts, which imposes liability for negligent misrepresentation on those who, in the course of business, supply "false information for the guidance of others in their business transactions." RESTATEMENT (SECOND) OF TORTS § 552(1); *Bilt-Rite*, 866 A.2d at 280.  The category is understood narrowly and "typically limited to those who are 'hired to advise'"—such as "attorneys, surveyors, inspectors of goods, architects, designers, accountants, and insurance agencies." *Zaftr, Inc. v. Lawrence*, No. 21-2177, 2023 WL 349256, at *30 (E.D. Pa. Jan. 20, 2023) (quotation omitted).  While Patel alleges that Miller downplayed the need for a bachelor's degree, staffing agencies like Kelly are arguably not in the business of convincing applicants they are qualified for a job.  As Patel's Amended Complaint outlines, Kelly is in the business of presenting to employers applicants whom *it* has determined meet the employers' requirements.

The Court will thus apply the traditional five-factor analysis from *Althaus ex rel. Althaus v. Cohen*, 756 A.2d 1166, 1168 (Pa. 2000), to determine whether to impose such a duty, recognizing that the Supreme Court of Pennsylvania has cautioned that new legal duties should not be imposed lightly. *Charlie v. Erie Ins. Exchange*, 100 A.3d 244, 252 (Pa. Super. Ct. 2014)

First, the Court must assess "the relationship between the parties." A legally-defined relationship between the parties is not required, but the lack of any "discernable relationship" between the parties weighs against imposing a duty. *Menkes v. 3M Co.*, No. 17-0573, 2018 WL 2298620, at *4 (E.D. Pa. May 21, 2018). In this case, the recruiter-applicant relationship weighs modestly in favor of a duty. Kelly and Patel's relationship is not so strong as that between parties to a contract or an employer and employee, yet they dealt directly with one another, over several weeks, with respect to the MSB position.

The second *Althaus* factor, the social utility of the actor's conduct, requires the Court to weigh the utility of the service the defendant provides to society against the utility of its allegedly problematic conduct. *Walters v. UPMC Presbyterian Shadyside*, 187 A.3d 214, 235 (Pa. 2018). The Supreme Court of Pennsylvania has recognized the "clear social utility in the presumptive efficiencies that staffing agencies introduce to the health care environment."[3] *Id.* Miller's alleged conduct of misrepresenting an employer's job requirements intuitively has little social utility, but does not detract greatly from the overall social benefit Kelly provides. A job candidate may derive

---

[3] Patel does not allege that any of Kelly's clients are outside the pharmaceutical industry. Even assuming Kelly serves employers across a range of industries, there is still significant social utility in the efficiencies recruiters introduce to the labor market in general.

8

personal benefit from getting accurate information from a recruiter regarding job requirements, but at the end of the day, the employer and recruiter—not the candidate—are responsible for performing the screening and hiring functions. Thus, the second *Althaus* factor weighs against imposing a duty to accurately state job requirements to a potential employee.

Third, the Court must assess "the nature of the risk imposed and foreseeability of the harm incurred." *Althaus*, 756 A.2d at 1169. There is a comparatively low risk that a potential candidate—who must also undergo a full interview and onboarding process—will be injured by a recruiter's inaccurate statement of the job's requirements. Indeed, it is not unheard of for workers to apply for jobs, knowing that they do not meet all the posted requirements, with the mindset that the only risk is not getting an offer. It is also not unheard of for employers to knowingly hire such applicants, either because it realizes the posted criteria are overly ambitious, or because it prioritizes "fit" over "hard skills." Undeniably, the risk of disappointment can be greater for a candidate who, like Patel, does not realize he is underqualified. But this is not the sort of risk that would justify imposing a legal duty.

The fourth factor looks to the consequences of imposing a duty. Patel argues that any consequence would be minimal because Kelly already has a similar contractual duty to its clients. Requiring recruiters to exercise care in regurgitating an employer's explicit job requirements would not be onerous. However, recruiters provide a range of services requiring varying degrees of expertise and professional judgment. Often, they are hired to identify candidates who would be a good "fit" for a position and may have flexibility to recommend candidates who do not strictly meet the employer's

9

requirements. *See* (Hrg. Tr. 16–17). In those instances, the burden of pinning down an employer's "requirements" may be more difficult than Patel suggests. This factor is neutral.

The final *Althaus* factor is the overall public interest in the proposed solution. The public certainly has an interest in getting truthful answers to questions about their qualifications for a position. Additionally, access to accurate information about an employer's job requirements is crucial in rooting out discriminatory hiring practices. On the other hand, as Plaintiff's counsel admits, this is "a very unique fact pattern." (*Id.* at 46:16.) This final factor, again, weighs only slightly in favor of imposing a duty.

Two of the *Althaus* factors counsel against the imposition of a duty, one is neutral, and the remaining two weigh only slightly in favor of a duty. Given the Pennsylvania Supreme Court's admonition that new common-law duties should not be imposed lightly, the Court cannot find that Kelly owed Patel a duty to describe MSB's job requirements accurately.

IV

In Count II, Patel alleges that Kelly breached a duty it owed him to accurately represent his credentials to MSB. "It is axiomatic that the elements of a negligence-based cause of action" in Pennsylvania "are duty, breach of that duty, a causal relationship between the breach and the resulting injury, and actual loss." *Charlie*, 100 A.3d at 250 (quotations omitted). As with the negligent misrepresentation claim, the key question here is whether Kelly owed Patel a duty.

In *Sharpe v. St. Luke's Hosp.*, 821 A.2d 1215, 1219 (Pa. 2003), the Pennsylvania Supreme Court found that a hospital hired by a company to drug test its employees had

a duty to employees to use reasonable care in administering the tests. It reasoned that the parties' relationship supported a duty because "Sharpe personally presented herself to the Hospital, which was aware of the purpose of the screening; the Hospital, in turn, should have realized that any negligence with respect to the handling of the specimen could harm Sharpe's employment." *Id*. *Fluke v. Hendrick & Struggles, Inc.*, No. 02-8385, 2003 WL 22316772, at *2–3 (E.D. Pa. Aug. 27, 2003), relying on *Sharpe*, held that the Pennsylvania Supreme Court would find that a consultant hired to evaluate a company's employees owes the employees a duty of reasonable care in conducting the evaluations. Here, as in *Fluke*, the relationship between Patel and Kelly is analogous to the one in *Sharpe* and, "[r]egarding the other *Althaus* factors, while Defendant's service is certainly socially useful, the Court sees no overriding public policy interest in protecting" recruiters "from liability for negligent performance." *Id*. at *2. Patel's negligence claim survives for now.

V

Patel next alleges that Kelly breached its implied contract to review Patel's submission and determine if his qualifications met MSB's position requirements. (Am. Compl. ¶ 52.) To state a claim for breach of contract under Pennsylvania law, a plaintiff must plead "(1) the existence of a contract, including its essential terms, (2) a breach of the contract; and (3) resultant damages." *Meyer, Darragh, Buclker, Bebenek, & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016). "The essential elements of breach of implied contract are the same as an express contract, except the contract is implied through the parties' conduct, rather than expressly written." *Enslin v. The Coca-Cola Co.*, 136 F. Supp. 3d 654, 675 (E.D. Pa.

11

2015). A plaintiff alleging the existence of an implied contract must plead facts that show the parties' mutual assent to be bound by its terms. *See Hirsch v. Schiff Benefits Grp., LLC*, No. 10-2574, 2011 WL 1166127 at *3 (E.D. Pa. March 28, 2011). Patel alleges that Kelly promised to review the materials he submitted and determine whether his qualifications met MSB's requirements. In exchange, he alleges that he agreed to exclusively use and cooperate with Kelly. But Patel fails to plead conduct manifesting Kelly's intent to be bound by such an agreement. The only support he offers for the allegation is the email Kelly sent in response to his resume, stating it "would review [Patel's] submission to determine if he meets the position requirements" and if Patel "was identified as a potential candidate, a recruiter from [Kelly] would contact [him] to initiate the recruiting process." (Am. Compl. ¶ 24.) This language merely communicates the next steps in Kelly's recruitment process. *See* 1 CORBIN ON CONTRACTS § 1.15 (2022) ("A person may express an intention to do something in the future without promising to do it."). There is no objective manifestation, either by words or conduct, indicating that Kelly believed itself or Patel to be bound by reciprocal obligations of the sort Patel alleges.

## VI

Patel argues that even if his contract claim fails, he should be allowed to recover on a theory of detrimental reliance.[4] The elements of a detrimental reliance claim are: "(1) a promise to a promisee, (2) which the promisor should reasonably expect will induce action by the promisee, (3) which does induce such action, and (4) which should be enforced to prevent injustice to the promisee." *C & K Petrol. Prods., Inc. v.*

---

4      Detrimental reliance is also referred to as "promissory estoppel." *C & K Petrol. Prods., Inc. v. Equibank*, 839 F.2d 188, 192 (3d Cir. 1988).

*Equibank*, 839 F.2d 188, 192 (3d Cir. 1988). A promise may be express or implied, but it will not be enforced if it is "broad" or "vague." *Dansko Holdings, Inc. v. Benefit Tr. Co.*, 991 F.3d 494, 500 (3d Cir. 2021) (quoting *C & K Petrol.*, 839 F.2d at 192); *see also Calderwood v. Rinsch*, No. 22-2847, 2022 WL 17251755 at *4 (E.D. Pa. Nov. 28, 2022) (collecting cases). The alleged promise must "express the intent of the parties with reasonable certainty." *Burton Imaging Grp. v. Toys "R" Us, Inc.*, 502 F. Supp. 2d 434, 439 (E.D. Pa. 2007) (holding statement that "[w]e're going to move ahead with you as long as everything that you're doing passes the [test]" was not enforceable promise to award contract to bidder who passed test).

In Patel's view, Kelly promised that it "would properly screen him to ensure he had the appropriate qualifications for the position and that [he] did in fact meet all of the job requirements." (Response Br. 16–17, ECF 19) (emphasis omitted). In *C & K Petroleum*, 839 F.2d at 192, a trade creditor of a bankrupt wholesaler sued the wholesaler's bank, which—without warning to the creditors—ended its policy of honoring checks written by the wholesaler on deposited but uncollected funds. To support its detrimental reliance claim, the creditor alleged that the bank impliedly promised "to administer the main checking account of [wholesaler] in the normal, banking fashion" and "that it is not intentionally scheming to encourage the issuance of checks it . . . knows will never be honored." *Id.* The Third Circuit held that "[p]romissory estoppel would be rendered meaningless if this Court were to allow C & K to maintain an action for detrimental reliance based on the alleged existence of such a broad and vague implied promise." *Id.* For the same reason, Patel fails to allege that Kelly made a promise definite enough to justify his reliance on it.

13

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*

GERALD J. PAPPERT, J.